UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHERYL HESS,

    Plaintiff,                                                 Civil Action No. 07-13138

v.                                                           HON. DAVID M. LAWSON
                                                            U.S. District Judge
                                                            HON. R. STEVEN WHALEN
COMMISSIONER OF SOCIAL           U.S. Magistrate Judge
SECURITY,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Cheryl Hess brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Supplemental Security Income ("SSI") under the Social Security Act. Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

## PROCEDURAL HISTORY

On April 6, 2004, Plaintiff filed an application for SSI, alleging disability as of August 29, 2003 (Tr. 48). After the initial denial of her claim, Plaintiff requested an administrative hearing, conducted on October 3, 2006 in Flint, Michigan before

Administrative Law Judge ("ALJ") John L. Christenson (Tr. 251). Plaintiff, represented by attorney Mikel Lupisella, testified, as did Vocational Expert ("VE") Pauline McEachim (Tr. 256-266, 266-269). In an administrative decision issued October 24, 2006, ALJ Christenson found that although Plaintiff was unable to perform any of her past relevant work due to non-exertional limitations, she retained the capacity for a significant range of sedentary work (Tr. 24-26). On June 15, 2007, the Appeals Council denied review (Tr. 5-7). Plaintiff filed for judicial review of the final decision on July 27, 2007.

## BACKGROUND FACTS

Plaintiff, born January 5, 1963 was 43 when the ALJ issued his decision (Tr. 48). She completed 10th grade[1] (Tr. 71). She worked previously as a housekeeper and launderer (Tr. 66). She alleges disability as a result of whiplash and vertigo following a workplace injury (Tr. 65).

### A.    Plaintiff's Testimony

Plaintiff, 43, testified that she lived in Mio, Michigan with her husband (Tr. 256, 258). She stated that although she currently held a driver's license, "dizzy spells" precluded driving (Tr. 257). Plaintiff, right-handed, reported a height of 5' 8" and a weight of 230 pounds (Tr. 257). She testified that she completed ninth grade (Tr. 258). She reported that she attended, but did not complete, a course at Baker College in medical terminology (Tr. 258-259).

---

[1] In contrast to her SSI application statement, Plaintiff testified at the hearing that she completed only ninth grade (Tr. 258).

Plaintiff testified that she last worked as a laundry supervisor in August 2003, adding that the position required heavy lifting and frequent standing and walking (Tr. 259). She reported that after hitting her head on a shelf on August 29, 2003 she was unable to work (Tr. 259-260). She indicated that prior to working as a launderer, she held positions as a housekeeper and merchandise stocker (Tr. 259-260). Plaintiff opined that she was now unable to perform any of her past work due to vertigo (Tr. 260). She alleged further that concentrational and memory problems would preclude even sedentary, unskilled work, indicating that she experienced dizzy spells without warning (Tr. 261).

Plaintiff reported that Antivert did not relieve symptoms of vertigo (Tr. 262). She indicated that she currently took Xanax for anxiety which created the side effect of drowsiness (Tr. 262, 266). She stated that water retention also required her to take Lasix (Tr. 262). Testifying that her husband's work required frequent travel, Plaintiff reported that she relied on her mother to perform household chores, shop for groceries, and take her to doctors' appointments (Tr. 262). She also indicated her father performed yard work for her (Tr. 263). She testified that she experienced "racing thoughts about suicide," adding that she slept poorly at night and napped two to three times each day (Tr. 363). She also stated that lifting even a dinner plate created neck and head pain, opining that she was unable to lift even five pounds (Tr. 264-265). She also alleged memory problems which had recently caused her to misplace "a very important piece of paper" (Tr. 265). Plaintiff concluded her testimony by stating that she also experienced blurred vision (Tr. 266).

    **B.    Medical Evidence**

### 1. Treating Sources

On August 29, 2003, Plaintiff sought emergency treatment after hitting her head on a wooden shelf at work (Tr. 119). Treating notes state that Plaintiff denied losing consciousness, but sustained "a laceration above the right eyebrow," without "a significant amount of bleeding" (Tr. 119). Kristin Nelson, M.D., noted that at the time of the examination, the laceration did not "extend through to subcutaneous tissue" (Tr. 120). The next week, a CT scan of Plaintiff's head showed normal results (Tr. 129). Thomas E. O'Hara, Jr., M.D., examined Plaintiff, noting that she complained of "persistent neck pain," headaches, anxiety, and "some short-term memory loss" (Tr. 124). Dr. O'Hara diagnosed Plaintiff with a mild concussion, headaches, short-term memory loss, and neck pain, finding that she should undergo further imaging studies (Tr. 126). A September 2003 x-ray of the cervical spine showed normal results, accompanied by a physician's assessment stating that Plaintiff's limited range of motion "may be effort related" (Tr. 127). An MRI of Plaintiff's brain taken the same month also showed normal results (Tr. 128).

In October 2003, Dr. George Mohamedally, D.O., issued a work release, stating that Plaintiff would be unable to resume work until November 16, 2003, later amending the release to December 17, 2003 (Tr. 152, 154). Also in October 2003, neurologist M.N. Sabbagh, M.D,. reported that EEG and brainstem auditory studies showed normal results (Tr. 192, 193). He noted that Plaintiff complained of dizziness, opining that she "seems to have had a closed head injury" (Tr. 147, 191). In November 2003, Dr. O'Hara recommended physical therapy, noting complaints of short-term memory loss, headaches, and

lightheadedness (Tr. 122-123). Plaintiff demonstrated "[g]ood visual acuity," a normal gait, with "fairly good" short and long-term memory (Tr. 122).

In February 2004, Dr. Mohamedally again extended Plaintiff's work release, finding on February 2, 2004 that Plaintiff was unable to work until February 21, 2004 (Tr. 144-145). The following month, Dr. Sabbagh examined Plaintiff, finding "no evidence of nystagmus and no focal motor deficit"[2] (Tr. 190). In July and November 2004 Dr. Sabbagh again found the absence of nystagmus, noting further that Plaintiff appeared awake and alert with full extremity strength (Tr. 188, 189).

On November 1, 2004, Dr. Mohamedally completed an assessment on behalf of Plaintiff's application for FIA benefits, finding that Plaintiff was precluded from all lifting, carrying, and manipulative tasks (Tr. 200, 202). Dr. Mohamedally found that Plaintiff was unable to walk, stand, or sit for more than 20 minutes in an eight-hour workday (Tr. 202). In December 2004, Srinivas Mukkamala, M.D., found that Plaintiff's reported symptoms were consistent with benign paroxysmal positional vertigo ("BPPV"), recommending vestibular rehabilitation (Tr. 199). In April 2005, a brainstem evoked response ("BSER") performed by Michigan Ear Institute showed normal results (Tr. 203). The same month, a videonystagmography ("VNG") found abnormal results consistent with "a left peripheral

---

[2]Nystagmus, referring to rapid, repetitive and involuntary eye movements, is caused by "abnormal function in the areas of the brain that control eye movements." http://www.nlm.nih.gov/medlineplus/ency/article/003037.htm#top

vestibular dysfunction" (Tr. 206). In October 2005, Plaintiff reported feeling "great" after undergoing gynecological treatment for hemorrhaging (Tr. 237).

**2. Consultive and Non-Examining Sources**

In July 2004 a Physical Residual Functional Capacity Assessment found that Plaintiff retained the ability to lift 20 pounds occasionally and 10 pounds frequently; the ability to sit, stand, or walk for six hours in an eight-hour workday, and limited pushing and pulling abilities in the upper extremities (Tr. 158). The Assessment further determined that Plaintiff was limited to *occasional* ramp and stair climbing; precluded from all ladder, rope, and scaffold climbing; and limited to *frequent* balancing, stooping, kneeling, crouching, and crawling (Tr. 159). The Assessment also found the absence of all manipulative, visual, and communicative limitations, but determined that Plaintiff should avoid the environmental hazards of machinery and heights due to allegations of dizzy spells (Tr. 161). Deeming Plaintiff only "partially credible," the report noted that "[w]hen observed at [the] Social Security office[,] no problems were observed walking, sitting[,] standing[,] [and] concentrating when being interviewed by SSA staff" (Tr. 162). The Assessment concluded by finding that Dr. Mohamedally's February 2004 opinion that Plaintiff was still disabled stood unsupported by medical testing, noting that later records showed that Plaintiff did not display a "focal motor deficit," and was "able to follow multi step commands" (Tr. 163).

The same month, psychologist Margaret K. Cappone, Ph.D., examined Plaintiff on behalf of the SSA (Tr. 165-168). Plaintiff stated that she had experienced Paroxysmal

Positional Vertigo and concussion syndrome since injuring herself at work in August 2003 (Tr. 165). She also reported feeling dizzy up to 20 times a day, claiming further that she experienced memory loss and blurred vision (Tr. 165). Plaintiff claimed that severe whiplash as a result of the accident also created chronic pain, arthritis, anxiety, and sleeping problems (Tr. 165). She reported good relationships with her mother, father, and son, indicating that her social activity was limited by her condition (Tr. 166). Dr. Cappone found that Plaintiff showed adequate contact with reality, but low self-esteem and dependence "on her mother for her welfare" (Tr. 167). Deeming Plaintiff's prognosis "poor," Dr. Cappone assigned her a GAF of $60^3$ (Tr. 168).

In August 2004, a Psychiatric Review Technique performed by Ronald C. Marshall, Ph.D., found that Plaintiff experienced organic mental and affective disorders (Tr. 174, 175, 177). Under the "B" Criteria, Plaintiff's restriction of activities of daily living and difficulties in maintaining concentration, persistence or pace were deemed "moderate," with "mild" difficulties in maintaining social functioning (Tr. 184).

The same day, a Mental Residual Functional Capacity Assessment found that Plaintiff's ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; complete a workday and workweek without interruptions from

---

[3]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school function. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders –Text Revision* at 34 (*DSM-IV-TR*), 30 (4th ed.2000).

psychologically based symptoms; and interact appropriately with the general public was moderately limited (Tr. 170, 171). Plaintiff's ability to respond appropriately to changes in the work setting and travel in unfamiliar places or use public transportation was also deemed moderately limited (Tr. 172). Dr. Marshall concluded that Plaintiff "appear[ed] to get along with others," but would work better in a low stress environment," stating that Plaintiff "[r]etains the ability to do unskilled tasks on a sustain[ed] basis" (Tr. 172).

In February 2005 Wilbur B. Leer, PhD, performed a consultive examination of Plaintiff at the request of her attorney (Tr. 196). Dr. Leer noted that results of the Beck Depression Index showed the presence of moderate depression (Tr. 196). Intelligence testing showed a verbal IQ of 91, performance IQ of 87, and full-scale IQ of 89 (Tr. 197). Dr. Leer found further that Plaintiff exhibited a mildly to moderately impaired memory function (Tr. 197). Plaintiff's visual motor skills were deemed mildly impaired on the right side and moderately impaired on the left (Tr. 197). Dr. Leer concluded that Plaintiff demonstrated "all the classic symptoms of a head injury . . . including fatigue headaches, decreased memory functioning, decreased frustration tolerance, slower processing, photosensitivity, and dizziness" (Tr. 197).

### C. Vocational Expert Testimony

VE Pauline McEachim classified Plaintiff's former work as stocker and housekeeper as exertionally medium, and work as a laundry supervisor at the exertional level of medium

to heavy[4] (Tr. 118).    ALJ Christenson  posed the following question to the VE:

> "I want you to make some assumptions for me.  I want you to assume that we have an individual the same age, education, and work experience as the claimant.  That individual has the following . . . residual functional capacity.  That would be to do sedentary work with a sit/stand option.  Simple routine tasks in a low stress environment.  By that I mean minimal changes in the work place setting.  No more than occasional contact with the general public.  No exposure to unprotected heights or unguarded hazardous machinery?"

(Tr. 268).  The VE replied that given the above limitations the individual could perform the unskilled, sedentary work of a surveillance monitor (2,000 jobs in the regional economy), visual inspector (2,200), and packer/sorter (1,500) (Tr. 268-269).  The ALJ then amended the hypothetical question to include "frequent unpredictable dizzy spells as well as anxiety and fatigue as well as medication required for anxiety [to the extent] that [the] individual cannot sustain sufficient concentration, persistence, and pace to do even simple routine tasks on a regular continuing basis . . ." (Tr. 269).   The VE replied that the additional limitations would preclude all work (Tr. 269).

**D.    The ALJ's Decision**

Citing Plaintiff's medical records, ALJ Christenson found that Plaintiff experienced the severe impairments of an anxiety disorder, post concussion syndrome, and vertigo, but

---

[4] 20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools;  *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy*  work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

that none of the impairments met or equaled any impairment listed in 20 CRF Part 404, Subpart P, Appendix 1 (Tr. 23, 26). Adopting the Psychiatric Review Technique's findings, the ALJ determined that Plaintiff experienced moderate difficulties in maintaining concentration, persistence or pace (Tr. 24, 184). The ALJ found that while Plaintiff was unable to perform any past relevant work, she retained the following residual functional capacity ("RFC"):

> "Sedentary work in a job that provides for a sit/stand option performing simple routine tasks in a low stress environment (. . . minimal changes in workplace settings) and no more than occasional contact with the general public with no exposure to unprotected heights or unguarded hazardous machinery"

(Tr. 24, 26). Also adopting the VE's job numbers, *supra*, the ALJ found that Plaintiff could perform "a significant number of sedentary jobs" including video surveillance monitor, visual inspector, and packer/sorter (Tr. 25, 26).

The ALJ found that Plaintiff's allegations of disability "not totally credible," finding that her claims of "severe complaints" were "not borne out by the record" (Tr. 24, 26). He noted that "[m]ultiple diagnostic tests confirm no brain abnormalities," noting further the lack of evidence supporting Plaintiff's claim that she "must often lie down during the day due to fatigue" (Tr. 24).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of*

*Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

### **FRAMEWORK FOR DISABILITY DETERMINATIONS**

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe

impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## **ANALYSIS**

Plaintiff argues first that the ALJ's hypothetical question did not fully account for the "moderate" limitations found by the August 2004 Psychiatric Review Technique ("PRT"), thus invalidating the VE's job findings. *Docket #6* at 6-18. Second, she contends that the ALJ failed to give "good reasons" for rejecting Dr. Mohamedally's November 1, 2004 finding that she was essentially precluded from all gainful work. *Id*; *citing* Tr. 200-202, *Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004).

### A. **Hypothetical Limitations**

A hypothetical question constitutes substantial evidence only if it accurately portrays the individual's physical and mental impairments. *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 779 (6th Cir. 1987). More recently, *Webb v. Commissioner of Social Sec.*, 368 F.3d 629 (6th Cir. 2004), rejected the notion that an ALJ is required to list all of a

claimant's maladies verbatim in the hypothetical question, nonetheless acknowledging that "[t]he hypothetical question . . . should include an accurate portrayal of [a claimant's] individual physical and mental impairments." (internal citations omitted) *Id.* at 632 (*citing Varley, supra,* 820 F.2d at 779). *See also, Smith v. Halter,* 307 F.3d 377, 379 (6th Cir. 2001).

Case law from this district and elsewhere suggests that the hypothetical limitations of "simple," "routine," and "low stress" may fail to account for "moderate" concentrational and pacing deficiencies, reasoning that the fact that a job is simple and routine has nothing to do with whether or to what degree a worker's moderate deficiencies in concentration will affect the timely completion of that job. *Benton v. Commissioner of Social Sec.* 511 F.Supp.2d 842, 849 (E.D.Mich.,2007)(Roberts, J.); *Edwards v. Barnhart,* 383 F.Supp.2d 920, 931 (E.D.Mich. 2005)(Friedman, J.); *Newton v. Chater,* 92 F.3d 688, 695 (8th Cir. 1996); *McGuire v. Apfel,* 1999 WL 426035, 15 (D. Or. 1999). *See Roe v. Chater,* 92 F.3d 672, 676-77 (8th Cir. 1996)("[L]ow stress" does not necessarily correlate with pace and the ability to complete tasks in a timely manner over an eight-hour workday).

Likewise, in the present case, Plaintiff, citing *Thomczek v. Chater*, 1996 WL 426247 (E.D. Mich. 1996)(Cohn, J.), argues specifically that the hypothetical question did not account for her moderate concentrational limitations as determined by the PRT and adopted by the ALJ (Tr. 24, 184). Plaintiff also faults the ALJ for failing to account for the Mental Residual Functional Capacity Assessment finding that her ability to "be punctual within customary tolerances," work without psychologically based interruptions, and perform at a

consistent pace was moderately limited (Tr. 170-172).

A "substantiality of evidence evaluation does not permit a selective reading of the record." *Davis v. Apfel,* 133 F. Supp. 2d 542, 547 (E.D. Mich. 2001). In this case, substantial evidence, including the PRT, easily supports the ALJ's choice of hypothetical limitations. Taken in isolation, the hypothetical limitations consisting of "[s]imple routine tasks in a low stress environment" and "minimal changes in the work place setting" might appear inadequate to account for "moderate" concentrational and pacing deficiencies. However, the record as a whole indicates that the hypothetical question and the ALJ's finding of "moderate" limitations findings are not incompatible.

**1. The Hypothetical Limitations Reflect the State Examiner's Conclusions.**

The ALJ's finding that Plaintiff experienced moderate deficiencies in concentration, persistence and pace, is taken from the PRT, completed on August 16, 2004 by Dr. Marshall (Tr. 24, 184). The same day, Dr. Marshall performed a Mental Residual Functional Capacity Assessment which concluded that Plaintiff" [r]etains the ability to do unskilled tasks on a sustained basis," noting that Plaintiff "[w]ill work better in a low stress environment" (Tr. 172). Drawing directly on Dr. Marshall's summation, the hypothetical question's mental limitations consisted of "[s]imple routine tasks in a low stress environment . . . . [with] minimal changes in the workplace setting" (Tr. 268). Having adopted Dr. Marshall's discrete finding that Plaintiff experienced moderate limitations, the ALJ also reasonably adopted Dr. Marshall's more detailed conclusion as to the Plaintiff's functional capacity for

work, forming the basis for both the hypothetical question and RFC (Tr. 24, 268). Plaintiff's argument for the selective adoption of Dr. Marshall's "moderate" limitations without considering his ultimate conclusion would amount to a distortion of the record. Likewise, Dr. Marshall's observation that Plaintiff experienced a moderately impaired ability to be punctual and complete her work without psychologically based interruptions must be analyzed alongside his conclusion that Plaintiff was capable of a limited range of work.

**2. Substantial Evidence Found Elsewhere in the Record Supports the Hypothetical Limitations**

The ALJ's discussion of Plaintiff's medical and mental health records amply supports his choice of hypothetical limitations. Discussing a consultive examiner's finding that Plaintiff experienced low self esteem and dependance on her mother, the ALJ noted that Plaintiff had nonetheless been assigned a GAF of 60, indicating only mild to moderate occupational limitations (Tr. 23). The ALJ also reviewed and discussed Dr. Leer's finding that Plaintiff experienced mildly impaired memory and an affective disorder[5] (Tr. 23).

In *Chartier ex rel. Chartier v. Astrue,* 2008 WL 795873, *4 (E.D.Mich.,2008)(Cohn, J.) the court held that despite the ALJ's finding that the plaintiff experienced "moderate" limitations in concentration, persistence, and pace, the hypothetical question, stating only that the plaintiff should be limited to "simple and repetitive tasks," was well-supported by the record. *Id.*; 07-10912, *Docket #9*, transcript pgs. 26, 531. Here as well, the ALJ was not

---

[5]The administrative opinion refers to Dr. Leer as Dr. "Beer" (Tr. 23).

required to use formulaic language to account for Plaintiff's moderate deficiencies, provided that the hypothetical question reflected her relevant limitations. *Smith, supra,* 307 F.3d at 379.

### 3. Substantial Evidence Contradicts Plaintiff's Claimed Level of Limitation.

The ALJ's choice of hypothetical limitations is further supported by evidence standing at odds with Plaintiff's claims of disability. Emergency room notes created the day of Plaintiff's accident indicate that she denied losing consciousness after injuring herself at work (Tr. 119). However, during a consultive examination performed on behalf of the SSA in July 2004, she alleged that at the time of the accident, she passed out for 10 minutes (Tr. 165). Plaintiff went on to testify at the hearing that she was "not aware of whether I lost consciousness or not" (Tr. 260).

Additional record evidence casts doubt on her allegations. September 2003 medical notes state that Plaintiff's range of motion limitations "may be effort related" (Tr. 127). Further, although Dr. Leer, hired by Plaintiff's attorney, noted that Plaintiff demonstrated "all the classic symptoms of a head injury," he acknowledged that his findings differed from an earlier neuropsychological evaluation that "did not give validity to her head injury symptoms" (Tr. 197). Dr. Leer also alluded to an earlier test of memory malingering ("TOMM") resulting in a score of only 26 out of 50 (Tr. 197-198). Finally, as discussed by the ALJ, Plaintiff's claims of extreme limitation were almost wholly unsupported by objective medical testing (Tr. 24). Although in April 2005 a VNG showed left peripheral

vestibular dysfunction, the remainder of objective testing and imaging studies showed normal results (Tr. 127, 128, 129, 190, 192, 193). Further, even assuming that the VNG study supports Plaintiff's claims of vertigo, it fails to explain her additional allegations of blurred vision, confusion, manipulative limitations, and inability to lift more than five pounds. The record amply supports the ALJ's selection of hypothetical limitations as well as his observation that Plaintiff "may not be fully motivated towards working" (Tr. 24).

### B. The Treating Physician Analysis

For overlapping reasons, I disagree with Plaintiff's contention that the ALJ failed to analyze or even mention Dr. Mohamedally's November 2004 finding that Plaintiff experienced disability level limitations. *Docket #6* at 17-18 (*citing Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004)).

"If uncontradicted, the [treating] physicians' opinions are entitled to complete deference." *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (FN 7)(6th Cir. 1991). Further,

> "[i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion."

*Wilson, supra,* 378 F.3d at 544. Regardless of whether substantial evidence is found elsewhere in the record to contradict the source's findings, the ALJ is required nonetheless

to give "good reasons" for rejecting the treating physician's opinion:

> "'The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where a claimant knows that his physician has deemed him disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"

*Wilson* at 544 (*citing Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999)).

First, Plaintiff's argument that the ALJ did not mention Dr. Mohamedally's disability finding is apparently based on the ALJ's misstatement that the evaluation in question occurred on October 29, 2004 rather than November 1, 2004. However, this minor date mixup does not invalidate the ALJ's substantive findings. Next, in compliance with the *Wilson* factors, the administrative decision noted that Plaintiff had received regular and long-term care from Dr. Mohamedally (Tr. 23). However, the ALJ permissibly went on to reject the treating physician's November 1, 2004 opinion by pointing out that it stood unsupported (as discussed in Section **A**.) by objective medical testing (Tr. 24). I note further that neither objective testing nor Dr. Mohamedally's own treatment records support his finding that Plaintiff was unable to perform any grasping, reaching, pushing/pulling, or fine manipulations (Tr. 202).

This Court notes in closing that its conclusion recommending the grant of summary judgment to the Commissioner is not intended to trivialize Plaintiff's legitimate complaints as a result of the above-discussed conditions. However, the overriding question in this appeal is whether the Commissioner's decision was supported by substantial evidence.

Based on a review of this record as a whole, the ALJ's decision is well within the "zone of choice" accorded to the fact-finder at the administrative level. Pursuant to *Mullen v. Bowen*, *supra*, the ALJ's decision should not be disturbed by this Court.

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be GRANTED, and that Plaintiff's Motion for Summary Judgment be DENIED.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the

objections.

                    S/R. Steven Whalen
                    R. STEVEN WHALEN
                    UNITED STATES MAGISTRATE JUDGE

Dated: April 29, 2008

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on April 29, 2008.

                    S/Gina Wilson
                    Judicial Assistant